2024 IL App (1st) 221226-U
No. 1-22-1226

FIRST DIVISION
April 15, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19 CR 14226 |
| | ) | |
| RICHARD DOWNS, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | James B. Linn, |
| | ) | Judge, presiding. |
| | ) | |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Coghlan concurred in the judgment.

**ORDER**

¶ 1        *Held*: (1) The State proved beyond a reasonable doubt that defendant committed first degree murder. (2) The circuit court did not err when it admitted the other-crimes evidence, nor did the admission of other-crimes evidence prejudice defendant. (3) Defendant's challenge based on the use of an investigative alert is without merit, as the admission of evidence derived from the arrest would be harmless error if the arrest was held unconstitutional.

¶ 2        Defendant, Richard Downs, appeals his conviction of first degree murder. He argues that

the State failed to establish that he was the individual who committed the murder since only

circumstantial evidence linked him to the crime; the circuit court erred when it admitted other-

crimes evidence; and his arrest pursuant to an investigative alert violated his Illinois constitutional right against unreasonable seizures. We affirm.

¶ 3                                    BACKGROUND

¶ 4        A grand jury indicted defendant with two counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2016)). The indictment alleged that defendant stabbed and killed Kevin Faulkner. Defendant entered a plea of not guilty. Prior to proceeding to a jury trial, both parties filed pretrial motions.

¶ 5                    A. Motion to Quash Arrest and Suppress Evidence

¶ 6        Defendant filed a motion to quash arrest and suppress evidence wherein he argued that the police lacked probable cause to arrest him. At the hearing on the motion, Detective Williams Sullivan testified he received an assignment to investigate a homicide that took place at 8334 South Cottage Grove on November 6, 2016. Sullivan was informed that the Illinois State Police Crime Lab recently determined that defendant's DNA was associated with DNA collected from the crime scene.

¶ 7        Sullivan reviewed reports, reviewed defendant's criminal history, reviewed videos, and reinterviewed witnesses. Sullivan learned that defendant had three prior incidents involving the use of a knife. A witness captured the incident with her cellphone, and she provided the video to the police. The attacker in the cellphone video had grey hair. Two witnesses described the attacker as five feet, five inches tall. Defendant had grey hair and was five feet, five inches tall.

¶ 8        Sullivan instructed the fugitive apprehension unit to arrest defendant. He did not obtain an arrest warrant. Two officers surveilled defendant's home. The officers arrested defendant when he exited his home on September 12, 2019. The arresting officers recovered a folding

knife. While defendant was in custody, Sullivan obtained a search warrant for a buccal swab from defendant.

¶ 9        Following argument, the circuit court denied the motion.

¶ 10                    B. Motion to Admit Other-Crimes Evidence

¶ 11        The State filed a motion to allow proof of other-crimes evidence. The State proffered three prior incidents. In 2006, defendant engaged in a verbal altercation with Richard Jones. During the altercation, defendant first threw a bottle at Jones, and then he grabbed him by his shirt and stabbed him multiple times with a pocketknife. In 2013, defendant walked up to Christopher Warner and stabbed him with a pocketknife near the 8600 block of South Ingleside. Defendant was upset about something. In 2014, defendant was in a relationship with Willie Mae Allen. During a verbal altercation with Allen, Defendant pulled out a knife. He then stuck his thumb in her eye. A third individual broke down the bedroom door and removed defendant off Allen. The State sought to introduce the other-crimes evidence based on *modus operandi*, identity, and intent.

¶ 12        The circuit court granted the State's motion with respect to the 2013 and 2014 incident. The circuit court reasoned that defendant had a consistent pattern of sudden unprovoked fits of violence with a knife. While the circuit court considered the 2006 incident in its analysis, it determined that the incident was too remote.

¶ 13                                C. Trial

¶ 14        At trial, Rosezita Whitehead testified that she lived at 8334 South Cottage Grove Avenue, Chicago, Illinois on November 6, 2016. At approximately 11:20 p.m., she heard a commotion outside the front of her building. From her window, she saw one man grab another man off his bicycle. Whitehead ran to grab her phone. When she returned, the two men where on the ground.

Whitehead described both men as black and older. She estimated that the man on top was approximately five feet, six inches to five feet, nine inches tall. During the entire encounter, the man on the bike was always on the bottom. The two men did not roll around, or change positions. Whitehead believed that the man on top leaned over and took something from the other man. The man on top walked away. The other man stayed on the ground, and he called out for help. Whitehead stopped recording, and she called the police.

¶ 15     The court admitted People's Exhibit 3 into evidence. Whitehead identified People's Exhibit 3 as the video she recorded with her cellphone on November 6, 2016, at approximately 11:20 p.m. In the video, a man with short grey hair wrestles with another man wearing a red jacket. The grey-haired man always remains on top. Throughout the video, the grey-haired man grabs the other man at the back right shoulder of his red jacket. At one point, the grey-haired man presses his head at the same position on the jacket.

¶ 16     On cross-examination, Whitehead admitted that she could not see either man's face. She initially thought that the man on top wore a hat, but she later believed that he had "greyish" hair. On redirect examination, Whitehead clarified that the man on the bicycle also wore a jacket. The grey-haired man grabbed the victim at the top portion of his jacket.

¶ 17     Darrain Bowdry testified that he lived at 8334 South Cottage Grove Avenue, Chicago, Illinois on November 6, 2016. At approximately 11:20 p.m., he heard a commotion outside the front of his building. By the time he looked outside, he saw one man walk away, and another man moaning on the ground. Both men were black and approximately in their 40s. He did not see the face of the man that walked away.

¶ 18     Detective Adrian Flores testified that on November 6, 2016, at around 11:20 p.m., he received a dispatch call for a battery in progress at 8334 South Cottage Grove Avenue. When he

arrived, other emergency personnel were already at the crime scene. The victim had been pronounced dead.

¶ 19    Detective Kevin Eberle testified that he and his partner, Detective Stanley Kalicki, responded to a homicide scene at 8334 South Cottage Grove Avenue, Chicago, Illinois on November 7, 2016, at approximately 12:15 a.m. The deceased victim wore a red and grey jacket. Eberle later learned that the victim's name was Kevin Faulkner.

¶ 20    Eberle spoke with Whitehead. Whitehead gave Eberle her cellphone so the police could obtain the video from it. From reviewing the video, he noticed that the offender was forcefully wrestling with the victim while on top of him. He also noticed the offender's head by the victim's upper right shoulder and upper right back area of the victim's jacket. Additionally, the offender grabbed or pushed the victim's jacket at the same position numerous times. Eberle reasonably believed that the offender may have transferred his DNA to that portion of the victim's jacket. He submitted the jacket for DNA testing.

¶ 21    On cross-examination, Eberle acknowledged that there were no eyewitnesses who could identify the offender. Eberle bagged the victim's hands to preserve potential DNA found under his fingernails.

¶ 22    Prior to Christopher Warner testifying, the circuit court gave a limiting instruction that his testimony could only be considered for the limited purposes of *modus operandi*, identity, and intent. Warner testified that he was crossing the street when defendant walked up to him and stabbed him with a pocketknife. This incident took place at night on October 27, 2013, at 8633 South Ingleside. Defendant stabbed him six to seven times. Defendant did not say anything, and he ran away after he stabbed Warner. Warner and defendant were neighbors. In 2013, defendant's hair was short, cropped, and grey.

¶ 23  Ponni Arunkumar, Chief Medical Examiner of Cook County, testified that the autopsy of Faulkner revealed that he had multiple sharp force injuries caused by a sharp instrument. Arunkumar differentiated that incise wounds are superficial wounds while stab wounds are deeper wounds. In total, Faulkner sustained approximately seven sharp force injuries: five incise wounds, and two stab wounds. Additionally, Faulkner sustained a blunt force injury to his head. The stab wounds pierced the left and right ventricles of his heart. The stab wounds resulted in blood loss and blood accumulation around the heart. Faulkner's injuries were consistent with injuries from a knife. The cause of death was multiple sharp force injuries, and the manner of death was homicide. The medical examiners also collected DNA samples from Faulkner in the form of a buccal swab, a blood card, and fingernail clippings.

¶ 24  Officer Anthony Cereceres testified that he happened to be around 8145 South Cottage Grove at night on January 3, 2014. He saw defendant who had short greyish hair, and was approximately five feet, five inches tall.

¶ 25  Officer Kevin McCann testified that on September 12, 2019, at approximately 10:40 a.m., he arrested defendant when defendant left his home located at 7552 South Colfax Avenue. He recovered silver pocketknife from defendant.

¶ 26  Scott Sigsworth, a forensic scientist, testified that he performed DNA analysis on evidence in this case. Faulkner's fingernail clippings revealed a mixture of two DNA contributors. Sigsworth separated a major and minor DNA profile from the mixture. A major contributor contributes more DNA than a minor contributor. Faulkner was included as a potential donor of the major DNA profile. The minor profile was inclusive which meant it was not suitable for comparison.

¶ 27    Sigsworth swabbed the upper right shoulder and back of the jacket for touch DNA. Touch DNA typically refers to DNA left behind when someone touches an item and leaves behind skin cells. The DNA analysis from the jacket revealed a mixture of two contributors: a major and a minor profile. Faulkner was included in the major profile. The minor profile was suitable for comparison. Sigsworth submitted the minor profile to a DNA database. The minor profile was associated with defendant. Based on the association, Sigsworth requested and received a buccal standard from defendant. Sigsworth generated a DNA profile from the buccal standard that was suitable for comparison. He then compared the DNA profile from defendant with the minor DNA profile from the jacket. Defendant was included as a potential donor of the minor profile. The statistical frequency of the inclusion of defendant in the minor profile of the jacket was one in 2.8 septillion.

¶ 28    On cross-examination. Sigsworth acknowledged that he could not say how the DNA got on the jacket or when. DNA can persist on an item for a long time, in fact; the analysis in this case was performed over two years after the jacket was originally collected. Sigsworth agreed that DNA could be transferred from a person to an object and from that object onto another object or person. He referred to this form of DNA transfer as secondary transfer. He agreed that DNA could potentially transfer a third time. He referred to this form of DNA transfer as tertiary transfer.

¶ 29    Sigsworth testified that he detected several genetic markers in the minor profile from the fingernail clippings. Defendant could not have contributed to those genetic markers. On redirect, Sigsworth stated that he did not consider the amount of DNA recovered from the jacket to be a small amount based on the amount recovered.

¶ 30    Detective William Sullivan testified that on May 27, 2019, he was assigned to this case since DNA analysis recently determined that the swab from the victim's jacket belonged to defendant. Sullivan reviewed reports, reviewed defendant's criminal history, reviewed videos that captured the incident, and reinterviewed witnesses. He did not find an association between the victim and defendant. After defendant was arrested, Sullivan obtained a search warrant to obtain a buccal swab from defendant.

¶ 31    On cross-examination, Sullivan acknowledged that none of the witnesses identified defendant, and that he was also not identified from any of the videos.

¶ 32    Jolanta Daisy testified that she happened to be near 8623 South Ingleside Avenue on August 9, 2010. She saw defendant who appeared to be a black male approximately five feet, five inches tall, with a short grey/black hairstyle.

¶ 33    The State rested. Defendant did not testify at trial. The defense did not present any evidence. Following closing arguments, the jury found defendant guilty of first degree murder. The circuit court sentenced defendant to 28 years' imprisonment.

¶ 34    Defendant appealed.

¶ 35                              ANALYSIS

¶ 36                      A. Sufficiency of the Evidence

¶ 37    On appeal, defendant argues that the State failed to prove him guilty beyond a reasonable doubt because the only evidence linking him to the crime was a minor DNA profile that could have been deposited through secondary or tertiary transfer. The State responds that the DNA profile recovered from the victim's jacket established that defendant was the individual in the cellphone video. Additionally, the State argues that the jury already rejected defendant's

argument that the DNA transferred onto the victim's jacket through secondary or tertiary transfer.

¶ 38    When reviewing the sufficiency of the evidence, the relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "This means the reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). We shall not substitute our judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). Additionally, we apply this standard regardless of whether the evidence is direct or circumstantial. *Id.* at 281. "Circumstantial evidence is sufficient to sustain a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged." *People v. Hall*, 194 Ill. 2d 305, 330 (2000).

¶ 39    "A person commits first degree murder if, in performing the acts that cause a death, he or she either intends to kill or do great bodily harm to the victim or another individual, knows that the acts will cause the victim's or another's death, or knows the acts create a strong probability of death or great bodily harm to the victim or another." *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 59; 720 ILCS 5/9-1(a)(1), (a)(2) (West 2016). Additionally, the State must prove beyond a reasonable doubt the identity of the person who committed the crime (*People v. Tomei*, 2013 IL App (1st) 112632, ¶ 36), which may be established by circumstantial evidence (*People v. Darrah*, 18 Ill. App. 3d 1018, 1022 (2nd Dist. 1974)).

¶ 40    Defendant argues that the State failed to establish that he was the individual who committed the murder since only circumstantial evidence links him to the murder—his DNA found on the victim's jacket. He argues that the DNA could have been deposited through secondary or tertiary transfer. While the jury could have determined that defendant's DNA deposited on the victim's jacket through secondary or tertiary transfer, "[a] trier of fact is not required to disregard inferences that flow normally from the evidence before it, nor must the trier of fact search out all possible explanations consistent with innocence and raise those explanations to a level of reasonable doubt." *People v. Eubanks*, 2019 IL 123525, ¶ 95.

¶ 41    At trial, Eberle testified that, while reviewing the cellphone video, he noticed the offender's head positioned by the victim's upper right shoulder and upper right back area of the victim's jacket. Additionally, he noticed the offender grabbed or pushed the victim on the same area of the jacket. Based on the video of the struggle, Eberle reasonably believed that the offender's DNA was transferred to the victim's jacket. He then submitted a request to the Illinois State Police Crime Lab to have that portion of the victim's jacket tested for DNA.

¶ 42    Sigsworth testified that he performed the DNA analysis on the victim's jacket. He swabbed the area of the upper right shoulder and back of the victim's jacket. From swabbing the victim's jacket, Sigsworth obtained a DNA profile suitable for testing. He submitted the profile to the national DNA database. The DNA profile was associated with defendant. According to that association, Sigsworth received defendant's buccal standard which he used to generate a DNA profile suitable for comparison. He compared that profile to the minor profile collected from the victim's jacket. Defendant was included as a potential donor of the minor profile. The statistical frequency of the inclusion was one in 2.8 septillion. Additionally, Sigsworth testified

that while he could not determine how the DNA got on the victim's jacket, he did not consider the DNA recovered to be a small amount.

¶ 43   Allowing all reasonable inferences in favor of the State (*Cunningham*, 212 Ill. 2d at 280), Eberle and Sigsworth's testimony established that defendant was the one who attacked the victim in the cellphone video. Additionally, this conclusion was bolstered by witness testimony that described defendant as having short grey hair which matched the offender in the cellphone video. Accordingly, the State proved beyond a reasonable doubt that defendant was the individual who attacked the victim in the cellphone video, and the jury's verdict was not so unreasonable as to justify a reasonable doubt of defendant's guilt. *People v. Smith*, 185 Ill. 2d 532, 542 (1999) (we will only reverse a conviction where the evidence is so unreasonable as to justify a reasonable doubt of defendant's guilt).

¶ 44   B. Other-Crimes Evidence

¶ 45   Defendant argues that the circuit court erred when it allowed the State to introduce other crimes evidence. The State responds that the other crimes evidence was relevant evidence of defendant's *modus operandi*, identity, and intent.

¶ 46   Other crimes evidence is admissible if it is relevant for any purpose other than to show the defendant's propensity to commit crimes. *People v. Wilson*, 214 Ill. 2d 127, 135 (2005). Thus, other crimes evidence is admissible to show *modus operandi*, intent, motive, identity, or absence of mistake. *People v. Pikes*, 2013 IL 115171, ¶ 11. "The circuit [court] must weigh the probative value of the evidence against its prejudicial effect, and may exclude the evidence if its prejudicial effect substantially outweighs its probative value." *People v.* Moss, 205 Ill. 2d 139, 156 (2001). We review a circuit court's decision whether to admit evidence for an abuse of discretion. *People v. King*, 2020 IL 123926, ¶ 35. "An abuse of discretion occurs only where the

[circuit] court court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Rivera*, 2013 IL 112467, ¶ 37. "Reversal is not appropriate under the abuse of discretion standard where reasonable minds can disagree about whether certain evidence is admissible." *People v. Sims*, 2019 IL App (3d) 170417, ¶ 29.

¶ 47    "Prior crimes admitted under the *modus operandi* exception are viewed as circumstantial evidence of identity because crimes committed in a similar manner suggest a common offender 'and strengthen the identification of the defendant.' " *People v. Moore*, 2023 IL (1st) 211421, ¶ 94 (quoting *People v. Shief*, 312 Ill. App. 3d 673, 681 (1st Dist. 2000)). "Where such evidence is offered to prove *modus operandi*, 'there must be a high degree of similarity between the facts of the crime charged and the other offenses in which the defendant was involved.' " *Shief*, 312 Ill. App. 3d at 681 (quoting *People v. Illgen*, 145 Ill. 2d 352. 372-73). "This high degree of similarity is necessary because proving identity under a theory of *modus operandi* involves reliance on an inference that a distinctive pattern of criminal activity earmarks the crimes as the work of a particular individual***." *People v. Robinson*, 167 Ill. 2d 53, 65 (1995). "Even if no particular distinctive feature is present, 'a sufficient number of common features can form a distinctive combination sufficient to establish the existence of *modus operandi*.' " *Moore*, 2023 IL (1st) 211421, ¶ 94 (quoting *People v. Hansen*, 313 Ill. App. 3d 491, 506 (1st Dist. 2000). "While there must be a persuasive showing of similarity, the test is not one of 'exact, rigorous identity,' since 'some dissimilarity will always exist between independent crimes.' " *Shief*, 312 Ill. App. 3d at 681 (quoting *Robinson*, 167 Ill. 2d at 65). "[R]ather, it is the similarity of the conduct as a whole, not the uniqueness of any single factor, which is the key to establishing *modus operandi*." *People v. Colin*, 344 Ill. App. 3d 119, 127

¶ 48    Here, defendant's stabbing of Warner, the only prior crime evidence admitted at trial, contained enough common features with the stabbing in this case. See *Robinson*, 167 Ill. 2d at 65-66. Both incidents took place on a public street on the south side of Chicago at night. In both instances, defendant, with little discernable provocation, stabbed the victim approximately seven times with a knife before fleeing the scene. We recognize that there are some differences between the two stabbing incidents. However, a "persuasive showing of similarity" does not require "exact, rigorous identity," since "some dissimilarity will always exist between independent crimes." (Internal quotation marks omitted.) *Shief*, 312 Ill. App. 3d at 681. Additionally, while the State only admitted one instance of other-crimes evidence, the circuit court compared a total of four incidents. The four incidents indicated a pattern by defendant that he resorted to stabbing with little discernable provocation. Moreover, while reasonable minds may disagree with the circuit court's decision to admit the other crimes evidence (*Sims*, 2019 IL App (3d) 170417, ¶ 29), it was not so unreasonable that no reasonable person would agree with it (*Rivera*, 2013 IL 112467, ¶ 37). Thus, the circuit court did not abuse its discretion when it admitted the other-crimes evidence under the *modus operandi* exception. *Wilson*, 214 Ill. 2d at 135 (other-crimes evidence is admissible if for any purpose other than propensity).

¶ 49    Assuming, *arguendo*, the circuit court erred when it admitted the other-crimes evidence, it did not prejudice defendant. "The improper introduction of other-crimes evidence is harmless error when a defendant is neither prejudiced nor denied a fair trial because of its admission." *Sims*, 2019 IL App (3d) 170417, ¶ 30. "An error in admitting other-crimes evidence is harmless if there is substantial evidence of the defendant's guilt." *Id*.

¶ 50    The State sought to introduce the other-crimes evidence on a *modus operandi* theory to bolster its proof that defendant attacked Faulkner in the cellphone video. Above, we concluded

that there was sufficient evidence to establish that defendant was the individual in the cellphone video. *Supra*, ¶¶ 39-42. Accordingly, although the circuit court did not err when it admitted the other-crimes evidence, the admission of the evidence was harmless.

¶ 51                                C. Investigative Alert

¶ 52        Defendant argues that the State violated his Illinois constitutional right against unreasonable seizures by arresting him pursuant to an investigative alert. The State responds that the police lawfully arrested defendant because they had probable cause.

¶ 53        There is a split of authority within this district as to the constitutionality of a warrantless arrest made pursuant to an investigative alert issued upon a detective's determination of probable cause. Two opinions of this court have determined that such an arrest violates the search and seizure clause of article I, section 6 of the Illinois Constitution. See *People v. Smith*, 2022 IL App (1st) 190691; *People v. Bass*, 2019 IL App (1st) 160640, *aff'd in part and vacated in part*, 2021 IL 125434. Other decisions in this district have held that an arrest pursuant to an investigative alert is constitutionally permissible if supported by probable cause. See *People v. Wimberly*, 2023 IL App (1st) 220809, ¶ 26; *People v. Bahena*, 2020 IL App (1st) 180197, ¶¶ 61-64; *People v. Simmons*, 2020 IL App (1st) 170560, ¶ 64; *People v. Thornton*, 2020 IL App (1st) 170753, 45-50 ¶¶; *People v. Braswell*, 2019 IL App (1st) 172810, ¶¶ 36-39.

¶ 54        Our supreme court has not yet issued a decision deciding this constitutional question. However, we need not take a position in this particular case as to the constitutionality of the defendant's arrest. This is because, even assuming *arguendo* there was a constitutional violation, the resulting admission of evidence was harmless error. This court has explained:

> "Harmless error review applies where a constitutional violation leads to erroneous admission of evidence. [Citation.] The test is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained at trial. [Citation.] When determining whether an error is harmless, a reviewing court may,

(1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it might have contributed to the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence. [Citation.] [O]n harmless error review, the question is not what the jury could have done but what the jury *would have* done absent the improperly admitted evidence. [Citation.]" (Emphasis in original.) (Internal quotation marks omitted.) *Smith*, 2022 IL App (1st) 190691, ¶ 103.

¶ 55    In this case, the admitted evidence derived from defendant's arrest consists of his pocketknife. Defendant argues that the admission of the pocketknife was not harmless beyond a reasonable doubt given that the State's case relied on weak circumstantial evidence—his DNA found on defendant's jacket. In essence, defendant reiterates his sufficiency of the evidence argument.

¶ 56    We previously concluded that the DNA and video evidence established beyond a reasonable doubt that defendant was the one who attacked the victim in the cellphone video. *Supra*, ¶¶ 39-42. As that evidence strongly supported the jury's verdict, we cannot conclude that the jury would have acted differently without the admission of the pocketknife. That is, we are convinced the verdict would have been the same, regardless of the evidence obtained from the arrest. In turn, we reject defendant's challenge based on the use of an investigative alert.

¶ 57                                    CONCLUSION

¶ 58    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 59    Affirmed.